# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JORNALEROS DE LAS PALMAS, | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION H-11-2703 |
| | § | |
| CITY OF LEAGUE CITY, AND | § | |
| MICHAEL W. KRAMM, IN HIS INDIVIDUAL | § | |
| CAPACITY AND OFFICIAL CAPACITY AS | § | |
| CHIEF OF POLICE OF LEAGUE CITY, | § | |
| *Defendants.* | § | |

## Findings of Fact and Conclusions of Law

This case brought under 42 U.S.C. § 1983 was tried to the court on September 24-28, 2012. The parties consented to the jurisdiction of this magistrate judge for all purposes, including final judgment (Dkt. 18). At issue is League City's alleged policy of targeting day laborers and applying (and mis-applying) state laws to prevent them from soliciting employment in the city.

Plaintiff Jornaleros de Las Palmas, an association of League City day laborers, seeks declaratory and permanent injunctive relief, but not monetary damages. Plaintiff sues under § 1983 for a declaratory judgment that Texas Transportation Code § 552.007(a) is an unconstitutional restraint on its members' First Amendment rights to free speech, both on its face and as applied by defendants. Plaintiff also sues for retaliation in violation of the First Amendment and for race and national origin discrimination in violation of the Fourteenth Amendment.

Based on the evidence presented at trial and applicable law, the court makes the

following findings of fact and conclusions of law.[1]

## I.     Findings of Fact

### *Background*

1.     Plaintiff is Jornaleros de Las Palmas, a group of day laborers living and working in League City, Texas. Tr. vol. 1 at 57-63,[2] 102-03; Tr. vol. 3 at 191, 197-98.

2.     Defendants are City of League City and Michael Kramm, in his official capacity as Chief of Police of League City.[3]

3.     League City has seen exponential growth in recent years, including a construction boom, which brought many day laborers to League City.  Admissions of Fact (Dkt. 131),¶ 2.

4.     Most, if not all, day laborers in League City are Latino men. Tr. vol. 1 at 36, 85; P. Ex. 39 at 39; P. Ex. 40 at 62; P. Ex. 38 at 131.

5.     Plaintiff's members and other day laborers in League City are generally hired as independent contractors by homeowners and small business contractors on a temporary basis to do construction, home improvement, and landscaping work. Tr. vol. 1 at 35; Tr. vol.

---

[1]     To the extent any item designated as a finding of fact is actually a conclusion of law, it is adopted as such and vice versa.

[2]     Volumes 1-5 of the trial transcript are on the record at Dkts. 160, 162, 164, 166, and 168.

[3]     *See* Dkt. 174, substituting Kramm as defendant for prior Chief of Police Douglas Wologo. Wologo was substituted for original defendant, former Chief Michael Jez (Dkt. 39). Texas Governor Rick Perry was originally named as a defendant in both his official and individual capacities, but the Texas Attorney General  elected to file a motion to dismiss (Dkt.7), which was granted (Dkt. 29), thereby leaving the defense of the challenged state statute to the municipal defendants.

3 at 216-17.

6.    The employment of day laborers is informal. Because the need for day laborers fluctuates and is seasonal, day laborers do not find work through traditional means, such as advertising.  Tr. vol. 1 at 33-36, 57, 99-101; Tr. vol. 3 at 193, 195.

7.    Instead, day laborers show that they are available for work by gathering in public at known locations and gesturing by hand to passing vehicles, typically between the hours of 6:00 a.m. and noon.  Tr. vol. 1 at 45-46, 99-101; Tr. vol. 3 at 158, 160, 192.

8.    Before September 2009, Latino day laborers, including plaintiff's members, congregated without police interference at the following locations in League City: a designated day labor site located at the League City Police Department (LCPD) at 600 West Walker Street; the Big Star Food Mart (formerly known as the One Star Food Mart) located at 1195 East Main Street; the Briar Palms Apartments (formerly known as the Las Palmas Apartments) located at 1215 East Main Street; and the Shady Oaks Apartments located at 115 Texas Avenue.  Dkt. 131, ¶¶ 11, 13; P. Ex. 38 at 100-01, 167; P. Ex. 40 at 117-18; Tr. vol. 1 at 31-32, 101-02, 201-03; Tr. vol. 2 at 54; Tr. vol.3 at 196-97, 202-05; Tr. vol. 4 at 144, 216.

9.    The LCPD site was for many years located off a dead-end street; by January 2008 the street had become a  through-street. Tr. vol. 3 at 100-01; Tr. vol. 2 at 54; Tr. vol. 4 at 20.

10.    The  day labor solicitation area at the police station site was not on a roadway,

3

and included benches, a bike rack, a lean-to for shade, and a portable restroom. Tr. vol. 2 at 127-28, 202; Tr. vol. 3 at 100-02, 204-06; P. Ex. 40 at 65-66; P. Ex. 55.

11.   Potential contractors seeking laborers turned into the police station parking lot, out of the flow of traffic. Tr. vol. 3 at 102, 205; P. Ex. 55.

12.   The Big Star convenience store site is located next to a laundromat at the corner of Reynolds Avenue and Main Street. D. Ex. 9(m); Tr. vol. 1 at 40-43; Tr. vol. 3 at 170, 207; Tr. vol. 4 at 33-34; Tr. vol. 5 at 36-37.

13.   Main Street is one of the arteries that feeds from IH-45 into League City. Tr. vol. 5 at 150.

14.   A fence runs along both Main and Reynolds, and partially encloses the private property abutting Reynolds. D. Ex. 9(m); Tr. vol. 1 at 43-44.

15.   The corner of Reynolds and Main has a sidewalk along Main that separates the private property from the roadway, but no such sidewalk exists along Reynolds. D. Ex. 9(m); Tr. vol 1 at 43; Tr. vol. 3 at 178-79; Tr. vol. 4 at 144; P. Ex. 40 at 47-49.

16.   The fence along Reynolds, across from the convenience store, is set back several feet from the roadway and the area unenclosed by the fence slopes downward to the road itself. D. Ex. 9(m).

17.   Day laborers congregated on the north side of Main, either along the sidewalk on Main, or in the ditch between the convenience store and the fence on Reynolds Avenue. Tr. vol. 1 at 43-44; Tr. vol. 3 at 178-79; Tr. vol. 4 at 144-46.

4

18.     Day laborers also congregated in the parking lot adjoining Reynolds Avenue, on the side of the convenience store.  Tr. vol. 4 at 144-46; Tr. vol. 3 at 178-79.

19.     Because day laborers frequented the convenience store to purchase groceries and other goods, the store owner encouraged them to frequent his store.  Tr. vol. 1 at 44-45; Tr. vol. 2 at 251-54; Tr. vol. 3 at 175-76; Tr. vol. 4 at 177; P. Ex. 49 at P-0187.

20.     Day laborers at the Briar Palms and Shady Oaks sites were typically residents of those apartment complexes, and would wait to solicit work either on the public sidewalks or easements outside of the apartment complexes, or in the parking lots of the complexes with the owner's permission.  Tr. vol. 3 at 203, 218; Tr. vol. 4 at 149; P. Ex. 40 at 144-45.

### Change of Policy Towards Day Laborers

21.     On August 20, 2009, Jez sent an email to all LCPD employees announcing that the police station day laborer site was being shut down, and that day laborers "may no longer assemble and solicit employment on municipal property."  J. Ex. 16; Tr. vol. 2 at 127-29.

22.     Prior to the shut down approximately twenty day laborers had been gathering daily at the police station site to solicit work.  Tr. vol. 3 at 110, 115-16.

23.     The site shutdown was precipitated not by traffic or safety concerns, but rather by an incident in which a female police officer, Sergeant Tamara Spencer, was subjected to "cat-calls" from day laborers while walking from her car into the police station. Tr. vol. 5 at 96.

24.     Upon hearing about Spencer's experience, then-Chief Michael Jez instructed

5

Spencer to have the bike rack, trash cans and portable potty removed and to have the lean-to

disassembled and removed if it was constructed and owned by the city.  Tr. vol. 2 at 127-29;

Tr. vol. 5 at 96; J. Ex. 16.

25.     As Jez instructed, the police station site was disassembled and Officer James

Gronseth issued three criminal trespass warnings to Latino day laborers at the police station

site.  P. Ex. 47 at LC-001311; P. Ex. 39 at 41-42, 45; P. Ex. 40 at 67-68.

26.     On September 2, 2009, Jez issued Special Order 09-07, which was effective

immediately and applied to all LCPD employees.  Dkt. 131, ¶¶ 15-16; J. Ex. 1; J. Ex. 17.

27.     The subject of Special Order 09-07 is "Day Laborers." Declaring that "there

is no constitutional guarantee to assemble and routinely violate existing municipal or state

statutes,"  the order directs LCPOs to "enforce . . . solicitation in the roadway" against day

laborers. J. Ex. 1.

28.     Special Order 09-07 emphasizes that it "is a long-term approach and will be

on-going." *Id.*

29.     Under Special Order 09-07, officers are instructed

> in the course of normal duties, to regularly monitor known
> gathering locations and take appropriate action on all observed
> statutory violations.   This includes aggressively citing or
> arresting, when circumstances warrant a custodial detention,
> motorists who stop in public roadways to solicit employment of
> day laborers, persons committing criminal trespassing, or
> persons found to be violating other order maintenance types of
> statutes. Officers will check known gathering locations multiple
> times throughout their tour of duty.

*Id.*

30.     After Jez issued Special Order 09-07, the LCPD complied with its directive to prevent day laborers from congregating in public places to solicit work. Tr. vol. 4 at 156.

31.     In accordance with Special Order 09-07, League City police officers began monitoring known day laborer gathering spots. Tr. vol. 2 at 140;  Tr. vol. 3 at 20-24, 52, 88, 200-01; Tr. vol. 4 at 153, 156, 170; P. Ex. 39 at 24, 27, 34; P. Ex. 40 at 117-18.

32.     As part of their patrol, police officers parked their squad cars near known gathering locations, regardless of whether day laborers were present.  P. Ex. 40 at 135-36; Tr. vol. 1 at 48, 50; Tr. vol. 3 at 200-01; Tr. vol. 5 at 67.

33.     Plaintiff's members walking in public were occasionally directed by officers to go inside, regardless of whether they were actually soliciting work at the time. Tr. vol. 1 at 52-53; Tr. vol. 3 at 216.

34.     Officers also began warning, citing and arresting day laborers for violations of Texas Transportation Code § 552.007(a) and Texas Penal Code § 30.05(a).  P. Ex. 40 at 96-97; Tr. vol. 4 at 47-61.

35.     Officers repeatedly told day laborers, including plaintiff's members, that they were prohibited from soliciting work from sidewalks and public easements at the convenience store site, and that they would be arrested if they continued to do so.  Tr. vol. 4 at 197-200; Tr. vol. 5 at 62.

36.     The LCPD recorded many calls for service at known day laborer congregation

locations over the years, including numerous calls to the "Lucky Chief" convenience store located at 1813 East Main.  D. Ex. 16; D. Ex. 17.

37.    The Lucky Chief business owner gave day laborers permission to be on the property because they "contributed to his sales." Tr. vol. 5 at 77-78.

38.    It is not clear how many of the calls specifically related to day laborers, nor does the record show any specific property damage, injury, or loss of life attributed to day laborers. *See* D. Ex. 16; D. Ex. 17; Tr. vol. 5 at 71-72.

39.    There is no evidence the number of calls for service was growing by August 2009, or that such calls motivated Jez to issue Special Order 09-07.

40.    Traffic congestion was a problem in League City in 2009, but there is no evidence that day laborers specifically caused any traffic accidents at the locations where they gathered.  *See* Tr. vol. 2 at 123-24; Tr. vol. 5 at 15-16.

41.    There is no evidence that traffic congestion motivated Jez to issue Special Order 09-07.

42.    Jez's "pet peeve" was day laborers, not Latinos in general. Tr. vol. 3 at 71-2, 73; P. Ex. 61.

43.    Some lawmakers and citizens in League City were concerned about illegal immigration and its impact on the community in 2009.  P. Ex. 44 at LC 0007; Tr. vol. 2 at 14-15.

44.    Special Order 09-07 does not mention illegal immigration.  J. Ex. 1.

45.     There is no evidence that non-Latino day laborers were treated differently than Latino day laborers under Special Order 09-07.

### *Criminal Trespass Citations and Arrests*

46.     As a result of LCPD's Special Order 09-07 enforcement activities, there was a spike in arrests in late 2009 and 2010 for criminal trespassing at known gathering locations for day laborers. Tr. vol. 4 at 55-57.

47.     The LCPD obtained powers of attorney (POAs) from business owners along the FM 518 corridor in order to enforce the state criminal trespass law, Texas Penal Code § 30.05(a), without first receiving a complaint. J. Ex. 2; P. Ex. 40 at 74, 96-99; P. Ex. 48; P. Ex. 78; Tr. vol. 2 at 230-31; Tr. vol. 3 at 59-60, 75-76; Tr. vol. 4 at 144, 151; Tr. vol. 5 at 38-41, 51.

48.     POAs obtained in 2009 were part of LCPD's effort to prevent day laborers from soliciting. P. Ex. 40, at 73-74; Tr. vol. 3 at 73-77; Tr. vol. 5 at 38-42, 51; J. Ex. 2; P. Ex. 78.

49.     "No trespassing" signs were put up inside and outside of the One Star convenience store. Tr. vol. 1 at 38-39.

50.     The posted sign reads "se prohibe la entrada," which means "do not enter." There was no sign saying no soliciting or loitering in the parking lot. P. Ex. 49 at P-0187; Tr. vol. 3 at 206-07.

51.     In 2009, of the total forty-five arrests for criminal trespass made by LCPD, twenty-seven occurred over the four-month period from issuance of Special Order 09-07

through the end of the year.  J. Ex. 42 at LC-001758-59.

52.     Of the 27 post-Special Order 09-07 arrests in 2009, 23 were of Latinos and over half were at known day laborer gathering locations.  *Id.*; Tr. vol. 4 at 56.

53.     In 2010, LCPD officers made a total of 27 arrests for criminal trespass; nine of those arrested are Hispanic.  J. Ex. 42 at LC-001759-60; Tr. vol. 4 at 39-40, 57.

54.     Between September 2009 and December 2010, LCPD officers gave hundreds of criminal trespass warnings; not all warning recipients were Hispanic.  D. Ex. 22.

### Solicitation Citations and Arrests

55.     Prior to issuance of Special Order 09-07, it was LCPD practice not to enforce Texas Transportation Code § 552.007(a).  This practice changed after Special Order 09-07 was issued. Tr. vol. 2, 139-40.

56.     Texas Transportation Code § 552.007(a) prohibits certain forms of solicitation by pedestrians in a "roadway," which is defined as "the portion of a highway, other than the berm or shoulder, that is improved, designed, or ordinarily used for vehicular travel."  TEX. TRANSP. CODE § 541.302(11).

57.     LCPD officers (incorrectly) interpreted   "roadway" for purposes of § 552.007(a) to include sidewalks, grassy areas, and essentially everything from "ditch line to ditch line."  Tr. vol. 3 at 81; Tr. vol. 4 at 162-63; J. Ex. 19; J. Ex. 22.

58.     From 2009 to 2011, only Latino males were cited and arrested for solicitation in League City, and most were day laborers. J. Ex. 41 at LC-001763-64; Tr. vol. 4 at 47-49.

59.     It was common practice for LCPD officers to arrest a violator, instead of issuing a citation, if the suspect did not have proper identification.  Tr. vol. 3 at 132-33.

60.     In 2008, there were two arrests for solicitation. J. Ex. 41 at LC-001763-64.

61.     From the issuance of the Special Order to December 31, 2009, the LCPD issued 11 citations for solicitation.  The LCPD made one arrest in 2009, in May.  J. Ex. 41 at LC-001763-64; J. Ex. 70 at LC-003935; Tr. vol. 4 at 49-50.

62.     In 2010, the LCPD issued 64 citations and made 37 arrests for solicitation.  J. Ex. 70 at LC-003935-36; Tr. vol. 4 at 50; J. Ex. 41 at LC-001763-64.

63.     In 2011, the LCPD issued 28 citations and made 2 arrests for solicitation. J. Ex. 70 at LC-003937; Tr. vol. 4 at 49-50; J. Ex. 41 at LC-001764.

64.     On February 5, 2010, Officer Murray led a sting operation that led to the mass arrest of 14 day laborers.  Tr. vol. 2 at 140, 235-36; Tr. vol. 5 at 42-45, 70; P. Ex. 43; P. Ex. 45.

65.     Officers drove a pick-up to the convenience store site where day laborers were soliciting work, communicated how many laborers they wanted, and arrested the laborers who entered their trucks.  Tr. vol. 5 at 70; P. Ex. 43.

66.     No police officer saw the day laborers soliciting in the actual roadway on this occasion.  Tr. vol. 5 at 70; P. Ex. 43.

### *Special Order 09-07 Remains in Effect*

67.     League City police officers charged with enforcing Special Order 09-07 believe

it is still in effect and continue to implement it. Tr. vol. 4 at 171; Tr. vol. 2 at 297; P. Ex. 40 at 118-19; P. Ex. 39 at 49-50; P. Ex. 38 at 145.

68.     The LCPD's written directive system requires that a special order without a self-cancelling deadline, such as Special Order 09-07, be cancelled in writing by the Chief of Police.  Tr. vol. 2 at 121, 288, 297; J. Ex. 3.

69.     The Chief of Police has not cancelled Special Order 09-07 in writing, and officers have not been instructed not to enforce it.  Tr. vol. 2 at 297; Tr. vol. 4 at 171; P. Ex. 38 at 168-69.


### *Solicitation by Non-Day Laborers*

70.     Solicitors other than day laborers were not targeted by Special Order 09-07. J. Ex. 1.

71.     The LCPD permitted firemen and policemen in the City of League City to solicit in the  roadway, including locations along FM518.  P. Ex. 40 at 125-29; Tr. vol. 1 at 142; Tr. vol. 2 at 33-34, 159-61.

72.     League City did not require firemen or policemen to follow Texas Transportation Code § 552.0071 by applying for permission before soliciting, and none have been cited or arrested for solicitation.  P. Ex. 40 at 125-29; P. Ex. 41; J. Ex. 70.

73.     Students and church organizations were also permitted to solicit without citation or arrest.  *See* P. Ex. 63 at LC-043756, LC-058913; Tr. vol. 4 at 35-36.

74.     Pursuant to an agreed permanent injunction entered in 2004, Houston Chronicle newspaper vendors were allowed to solicit in medians and along rights of way without citation or arrest under Texas Transportation Code § 552.007(a). Tr. Vol. 2 at 156, 211.[4]

### Formation of Jornaleros de Las Palmas

75.     In response to the 2009 police crackdown, a group of day laborers began to mobilize and organize, and named themselves Jornaleros de Las Palmas. Tr. vol. 1 at 56-61, 103-05; Tr. vol. 3 at197-99.

76.     Plaintiff's members sought and continue to seek work as day laborers in League City. Dkt. 131, ¶ 3.

77.     The group met almost twice a week in 2009 and elected leaders. Tr. vol. 1 at 58; Tr. vol. 2 at 75-76; Tr. vol. 3 at 197-98; Tr. vol. 4 at 115-17.

78.     The Jornaleros sought the help of Francisco Arguelles, an organizer at the Houston Interfaith Worker Justice Center, to assist in protecting their right to solicit employment from public spaces, and he eventually became a member of the group.  Tr. vol. 1 at 62-63; Tr. vol. 3 at 198-99.

79.     Arguelles coordinated a meeting on January 20, 2010, at the League City Police Department, with plaintiff's members, concerned community residents, and Jez regarding Special Order 09-07.  Tr. vol. 1 at 67-69; Tr. vol. 2 at 148-50; Tr. vol. 3 at 208-12; Dkt. 131,

---

[4]     The court takes judicial notice of *Houston Chronicle Publishing Co. v. Sistrunk,* No. 03-CV-1587, 122nd Judicial District Court of Galveston County, Texas, Agreed Judgment and Permanent Injunction (Mar. 3, 2004).

¶ 17.

80.     At the meeting, the members expressed their concerns to Jez . Tr. vol. 2 at 148-50; Tr. vol. 3 at 208-12; Tr. vol. 4 at 116-17.

81.     The members and community residents also sought Chief Jez's help in identifying a public site where day laborers could solicit work without fear of intimidation and arrest from the LCPD.  Tr. vol. 2 at 148-50; Tr. vol. 3 at 211; Tr. vol. 4 at 118-19.

82.     Jez refused to identify such a site, and warned members they would be arrested if they solicited work in the roadway or on public or private property.  Dkt. 131, ¶ 17; Tr. vol. 2 at 148-50; Tr. vol. 3 at 210-11; Tr. vol. 4 at 116-19.

83.     Jez informed the members that the only way that they could solicit day labor in League City was on private property with the owner's permission.  Tr. vol. 4 at 118-19.

### Injury to Plaintiff's Members

84.     Since September 2009, League City has left no public space available for day laborers to congregate and solicit employment without fear of arrest.  Tr. vol. 5 at 56-57, 150-51; Tr. vol. 4 at 149-50, 163; Tr. vol. 3 at 138, 140, 212; Tr. vol. 2 at 148-50; P. Ex. 40 at 120-21.

85.     League City police officers continue to believe that soliciting day labor on public property in League City is unlawful and subjects day laborers to warning, citation, or arrest.  Tr. vol. 5 at 150-51; Tr. vol 4 at 163; Tr. vol. 3 at 81, 140; P. Ex. 40 at 120-21.

86.     Plaintiff's members have been arrested as a result of implementation of Special

Order 09-07. P. Ex. 45; J. Ex. 41; Tr. vol. 1 at 60-64; Tr. vol. 3 at 213-14.

87.     In 2009, a member, known on the record as Amado AC, personally observed the arrest of some of his fellow day laborers while soliciting work on public property and in the parking lot of the convenience store despite being there with the owner's consent.  Tr. vol. 1 at 56.

88.     Around the same time, Amado AC was walking down the sidewalk when a League City officer told him to go back to his apartment.  Tr. vol. 1 at 52-53.

89.     On another occasion, Amado AC was inside the convenience store playing video games when an officer came in to remind him he could not be outside.  Tr. vol. 1 at 48-51; D. Ex. 16 at 62.

90.     As a result, Amado AC now rarely solicits day labor in public, even though he needs to do so to make financial ends meet. Tr. vol. 1 at 33, 56.

91.     Emilio AY, another member, is scared to solicit work in League City for fear of arrest under the City's policy, although he desires to do so.  Tr. vol. 1 at 101-02.

92.     Door-to-door solicitation is not a viable alternative for day laborers, because such activity would likely generate fear and apprehension by homeowners and residents who did not know them. Tr. vol. 1 at 68-69.

93.     Plaintiff's members live in fear of arrest when they are walking in public and even as consumers in private businesses.  Tr. vol. 1 at 56, 101-02, 124; Tr. vol. 3 at 211-12, 215-16; Tr. vol. 4 at 199; Tr. vol. 5 at 67.

94.     Plaintiff's members and other day laborers no longer solicit from public sidewalks or at the convenience store site, despite having permission to do so from the business owner.  Tr. vol. 1 at 48-49, 107; Tr. vol. 3 at 188; Tr. vol. 5 at 101-02; P. Ex. 40 at 60-61; Tr. vol. 4 at 147.

95.     If they did not fear citation, arrest, or harassment from the LCPD, plaintiff's members would solicit work in public in League City, and on private property where they have permission to do so.  Tr. vol. 1 at 68, 107, 116.

## II      Conclusions of Law

### *Standing*

1.      *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977), provides the relevant standard for associational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

2.      The first two elements address constitutional requirements; the third is solely prudential.  *Association of Amer. Phys. & Surg., Inc. v. Texas Med. Brd.*, 627 F.3d 547, 550 (5th Cir. 2010).

3.      To establish standing, a plaintiff must show: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. *E.g.*, *Lujan*

16

*v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

4.    Chilling a plaintiff's speech is a constitutional harm sufficient to satisfy the injury-in-fact requirement. *Houston Chron. Pub. Co v. City of League City, Tex.*, 488 F.3d 613, 618 (5th Cir. 2007).

5.    An arrest, or reasonable fear of imminent arrest, is also an injury-in-fact. *Id.* (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

6.    The court has made factual findings that some of plaintiff's members have experienced a chilling of their free speech rights due to citations, arrests, and fear of future arrests. *See, supra*, ¶¶ 87-98.

7.    It is not necessary to show that every member of an association has suffered an injury in fact.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (an association shows injury in fact when its members "or any one of them" suffer immediate or threatened injury).

8.    The court's findings of fact establish that Special Order 09-07 lead to increased warnings, citations, and arrests of day laborers in League City for solicitation under Texas Transportation Code § 552.007(a) and trespassing under Texas Penal Code § 30.05(a). Thus, plaintiff's members' injuries are directly traceable to the challenged policy.

9.    The court's findings of fact establish that Special Order 09-07 has not been rescinded, and that plaintiff's members continue to fear arrests. Thus, a favorable decision enjoining its enforcement and declaring Texas Transportation Code § 552.007(a) unconstitutional will alleviate the injury to plaintiff's members.

17

10.     "The germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Association of Amer. Phy. & Surg., Inc. (AAPS) v. Tex. Med. Brd.*, 627 F.3d 547, 551 n.2 (5th Cir. 2010).

11.     Jornaleros de Las Palmas was formed by a group of Latinos who decided to organize more formally to learn about their rights in response to what they perceived as a police crackdown on day laborers.

12.     The current lawsuit clearly seeks to protect interests germane to plaintiff's purpose.

13.     As the Supreme Court explained in the seminal case *Warth v. Seldin*, 422 U.S. 490, 511 (1975):

> [S]o long as the nature of the claim and of the relief sought does not make the individual participation of *each* injured party *indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke this court's jurisdiction.

(emphasis added).

14.     *Hunt*, which derived its three part test from *Warth*, does not hold that associational standing is destroyed if *any* participation by *any* member is required.

15.     The Fifth Circuit has consistently recognized that individual participation is not required where "the claim asserted and the relief requested affect the membership as a whole." *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276-80 (5th Cir. 1981); *see also Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012) (claims of non-profit environmental groups challenging Department of Interior approval of drilling

18

applications in wake of Deepwater Horizon spill "are not particular to any individual" and "are thus properly resolved in a group context"); *Familias Unidas v. Briscoe*, 619 F.2d 391, 398 n.2 (5th Cir. 1980) ("the declaratory relief sought, inuring as it would to the benefit of all members, is ideally suited to allowing 'associational standing.'").

16.     This prong of standing addresses "matters of administrative convenience and efficiency." *Id.* at 551 (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996)).

17.     The claims asserted and the relief requested in this case are well-suited for associational standing.

### *Municipal policy*

18.     In order to state a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must allege a constitutional violation resulting from a municipal custom or policy. *Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 690-94 (1978).

19.     An "official policy" includes "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).

20.     A policymaker for purposes of § 1983 municipal liability can be someone who takes the place of the governing body in a designated area of city administration. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (citing *Webster*, 735 F.2d at 841).

21.     League City has delegated policymaking authority for the LCPD to the Chief

of Police. LEAGUE CITY, TEX., CODE OF ORDINANCES, ch.2, art. III, § 2-87(a); Tr. vol. 2 at

116-17; Dkt. 131, ¶ 5.

22.     Special Order 09-07 is a municipal policy for the purpose of plaintiff's 42

U.S.C. § 1983 claims against League City.

### Facial Challenge to Tex. Transp. Code § 552.007(a)

23.     Ordinarily, a party bringing a facial challenge to the constitutionality of a

statute must establish that "no set of circumstances exists under which the Act would be

valid," *United States v. Salerno,* 481 U.S. 739, 745 (1987), or that the statute lacks any

"plainly legitimate sweep." *Washington v. Glucksburg,* 521 U.S. 702, 740 n. 7 (1997)

(Stevens, J., concurring in judgments).

24.     These standards do not govern facial attacks based on the First Amendment,

however. *United States v. Stevens,* 559 U.S. 460, 130 S. Ct. 1577, 1587 (2010).

25.     Under the First Amendment, a law may be invalidated as facially over-broad

if "a substantial number of its applications are unconstitutional, judged in relation to the

law's plainly legitimate sweep." *Id.* (quoting *Washington State Grange v. Washington State*

*Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

26.     In such cases, the plaintiff must describe arguable instances of the law's over-

breadth, but need not introduce admissible evidence to that effect. *Comite de Jornaleros de*

*Redondo Beach v. City of Redondo beach,* 657 F.3d 936, 944 (9th Cir. 2011) (*en banc*)

(citing *Washington State Grange,* 552 U.S. at 449, n.6).

27.    Where a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack. *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 967-68 (1984).

28.    In general, solicitation constitutes protected expression under the First Amendment. *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 677-78 (1992); *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632 (1980). In particular, day laborers such as those in League City are exercising their First Amendment freedom of speech when they solicit employment from occupants of vehicles on public streets or highways. *See Comite de Jornaleros de Redondo Beach*, 657 F.3d at 946.

29.    Protected speech is subject to a government's power to preserve the property under its control for the use to which it is lawfully dedicated. *Greer v. Spock,* 424 U.S. 620, 629 (1976). The permissible scope of this government regulation varies depending on the nature of the forum. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985).

30.    Public streets and sidewalks occupy a special position in terms of First Amendment protection. *Snyder v. Phelps,* 131 S. Ct. 1207, 1218 (2011); *United States v. Grace,* 461 U.S. 171, 180 (1983). In these "quintessential" public forums, the government

may not prohibit all communicative activity. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).

31.     When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions. *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816 (2000).

32.     In order to enforce a content-based restriction in a traditional public forum such as a public street, the government must show that its regulation is necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Carey v. Brown,* 447 U.S. 455, 461 (1980). This standard is essentially the same as the strict scrutiny test governing Equal Protection Clause challenges to laws classifying persons in a manner that burdens their exercise of fundamental rights. *Id.*  at 461-62.

33.     Whether a statute is content-neutral is something that can be determined from the face of it; if the statute describes speech by content then it is content-based. *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 448 (2002) (Kennedy, J., concurring). A content-based purpose may also be sufficient to show that a regulation is content-based. *Turner Broad. Sys., Inc., v. FCC,* 512 U.S. 622, 642 (1994).

34.     Texas Transportation Code § 552.007(a) reads:

(a)   A person may not stand in a roadway to solicit a ride, contribution, employment, or business from an occupant of a vehicle, except that a person may stand in a roadway to solicit a charitable contribution if authorized to do so by the local authority having jurisdiction over the roadway.

35.    Section 552.007(a) of the Texas Transportation Code is a content-based restriction on protected speech, because it forbids some but not all solicitation by a person standing in a roadway. Only solicitation for "a ride, contribution, employment, or business from an occupant of a vehicle" is proscribed. Other forms of solicitation, such as seeking political votes, support for pending legislation or social causes, or membership in a church or other organization, may continue unabated. *See Comite de Jornaleros de Redondo Beach*, 657 F.3d at 953 (M. Smith, J., specially concurring) (construing a similar city ordinance to be content-based).

36.    Section 552.007(a)'s prohibition includes non-commercial forms of solicitation (*e.g.*, a ride or a contribution) and so the validity of the statute is not governed by the Supreme Court's commercial speech case law. *Id.* at 945 n.2.

37.    Section 552.007(a) also contains an express exception for solicitation of charitable contributions if authorized by the local authority. On the basis of this exception, the Texas Attorney General has issued a formal opinion declaring this statute to be a content-based speech restriction. Tex. Att'y Gen. Op. DM-367, 1995 WL 758923 (1995).

38.    League City has agreed to a permanent injunction prohibiting it from enforcing Section 552.007(a) against Houston Chronicle vendors. *Houston Chronicle Publishing Co. v. Sistrunk,* No. 03-CV-1587, 122nd Judicial District Court of Galveston County, Texas, Agreed Judgment and Permanent Injunction (Mar. 3, 2004). Thus, newspaper vendors represent another form of solicitation legally exempted from the statute's sweep.

39.     As a content-based restriction on protected speech in a traditional public forum, Section 552.007(a) is presumptively invalid, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), and may be upheld only if it satisfies "the most exacting scrutiny." *Turner Broad. Sys.,* 512 U.S. at 642.

40.     The regulation must be narrowly tailored to promote a compelling government interest, and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813 (2000).[5]

41.     According to the City, the primary government interests in enforcing this statute against day laborers are to promote traffic safety and control. Public safety is a compelling interest at the heart of government's function. *See Houston Chronicle Publishing Co. v. City of League City,* 488 F.3d 613, 622 (5th Cir. 2007) (rejecting a facial challenge to city ordinance making it unlawful for a person within a public roadway "to solicit or sell or distribute any material to the occupant of a vehicle stopped on a public roadway in obedience to a traffic control signal light.").

42.     The League City ordinance (§ 78-39) upheld by the Fifth Circuit in *Houston Chronicle* is substantially dissimilar to the Texas statute at issue here. Unlike Section

---

[5]     If the regulation were a content-neutral restriction of the time, place or manner of expression, the state's burden is somewhat less: it must show the regulation to be narrowly tailored to serve a significant (not necessarily compelling) government interest, and leave open ample alternative channels of communication. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 (1984). League City cannot meet even this lesser standard because it has left open no other adequate channels of communication for day laborers.

552.007(a), that League City ordinance prohibits solicitation for any purpose, not just those enumerated in 552.007(a) ("a ride, contribution, employment, or business"); contains no express exception for charitable solicitation; and is narrowly tailored to prohibit solicitation only of a vehicle "stopped on a public roadway in obedience to a traffic control signal light." 488 F.3d at 616. Given these material differences, that holding of *Houston Chronicle* is not controlling here.

43.    The defendants have not shown the statute to be narrowly tailored to achieve the stated goal of promoting traffic safety and control. For example, the law incorporates exceptions for certain types of roadway solicitation, which presumably pose an equal risk to public safety; it applies to all roadways, paved or not, and at all intersections, regardless of traffic flow;[6] and it applies to vehicles lawfully parked on the side of the road, as well as to vehicles passing on the street without slowing down.

44.    The defendants have provided no credible evidence that day laborer solicitation ever caused any traffic accident in League City. *See, supra,* ¶ 40.

45.    Finally, the defendants have not shown why other traffic laws which do not target speech are inadequate to serve the public's legitimate interest in traffic safety and control. *See, e.g.,* TEX. TRANS. CODE § 545.302.

46.    In sum, Texas Transportation Code §552.007(a) is a content-based restriction of speech in a traditional public forum, not narrowly drawn to achieve a compelling state

---

[6]    *Compare* League City ordinance § 78-39, forbidding solicitation from vehicles stopped at traffic control lights.

interest. Because a substantial number of its applications are unconstitutional, the statute in all its applications creates an unnecessary risk of chilling free speech. The statute is thus facially over-broad and invalid under the First Amendment.

### *"As Applied" Challenge to Tex. Transp. Code § 552.007(a)*

47.     A First Amendment "as-applied" claim is a challenge to the statute's application to the litigants' own expressive activities. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 803 (1984).

48.     The underlying First Amendment standard for an as-applied challenge is no different than the standard for a facial challenge. *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331(2010).

49.     League City police officers apply the law to plaintiff's members unconstitutionally by enforcing Section 552.007(a) in areas outside the law's definition of "roadway."

50.     The definition of roadway for purposes of Transportation Code Title 7, Subtitle C (where § 552.007 appears) is limited to "the portion of a highway, other than the berm or shoulder, that is improved, designed, or ordinarily used for vehicular travel." TEX. TRANSP. CODE § 541.302(11). Under a plain reading of this definition, the "roadway" does not include an adjacent shoulder, berm, sidewalk, median, ditch, or public easement.

51.     Defendants appear to rely on a broader definition of "roadway" found in one particular section of the Texas Transportation Code, entitled "Local Authorization for

26

Solicitation By Pedestrian." TEX. TRANSP. CODE § 552.0071(g). By its terms, this definition of "roadway" applies to the charitable solicitations described and authorized by subsection (a) of Section 552.0071. It does not apply to the *prohibitions* on solicitation set out in § 552.007(a).

52.     League City police officers consistently and mistakenly applied this over-broad definition of roadway when enforcing § 552.007(a) against day laborers. *See, supra*, ¶¶ 35, 60, 88.

53.     League City police officers also selectively enforced § 552.007(a) by using it to prohibit solicitation by day laborers, but not by others. Special Order 09-07 is titled "Day Laborers" rather than "Pedestrians" or "Solicitors," and does not direct officers to monitor any other type of solicitation. As a result, officers allowed other groups, such as public employees, church groups, and youth groups, to solicit in places where day laborers were forbidden to do so. *See, supra*, ¶¶ 73-77.

54.     Defendants enforcement of § 552.007(a) against day laborers was not narrowly tailored, nor did it allow ample alternative means for them to solicit employment in League City.  There are now no public places in League City where day laborers may solicit work without threat of law enforcement. Forcing plaintiff's members to exercise their First Amendment rights only upon dispensation from private property owners is not a meaningful alternative. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1979) ("Whether petitioner might have used some other, privately owned, theater in the city for the

27

production is of no consequence.").[7]

55.     For these reasons, plaintiff is entitled to a declaratory judgment that Texas Transportation Code § 552.007(a) is unconstitutional on its face and as applied to plaintiff's members.

### *First Amendment Retaliation*

56.     The First Amendment prohibits adverse governmental action against a person for engaging in protected speech activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

57.     To succeed on its First Amendment retaliation claim, plaintiff must prove: (1) defendants acted under color of state law; (2) plaintiff's members engaged in constitutionally protected activity; and (3) the exercise of protected speech activity by plaintiff's members substantially motivated defendants' actions. *Rolf v. City of San Antonio*, 77 F.3d 823, 827 (5th

---

[7]     The result would be the same if the day laborers were engaged in purely commercial speech, as the defendants contend and the Ninth Circuit concluded in *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818-19 (9th Cir. 2013) (enjoining enforcement of an Arizona anti-day labor solicitation ordinance). Commercial speech is not free from Constitutional protection. *Virginia State Brd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). Regulations governing commercial speech that is neither misleading nor related to illegal activity must (1) seek to implement a substantial governmental interest, (2) directly advance that interest, (3) and extend only as far as necessary. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564-65 (1980). The court has already concluded that the interest proclaimed by the government here, traffic safety, is compelling, so there is no doubt it is also substantial. As discussed above, § 552.007(a) is much broader than is necessary to advance that interest. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667-68 (2011) ("As in previous cases, however, the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied . . . it is the state's burden to justify its content-based law as consistent with the First Amendment. . . . There must be a fit between the legislature's ends and the means chosen to accomplish those ends.").

Cir. 1996).

58.      Defendants unquestionably acted under color of state law when, pursuant to Special Order 09-07, they began aggressively enforcing state solicitation and trespassing laws against League City day laborers.

59.      Special Order 09-07 was issued by police chief Michael Jez under color of state law.

60.      Plaintiff's members engaged in constitutionally protected activity when soliciting work as day laborers.

61.      Prior to the issuance of Special Order 09-07 in September 2009, the LCPD had a practice and custom not to enforce § 552.007(a). *See, supra,* ¶ 55.

62.      Special Order 09-07 lead to a dramatic increase in citations and arrests of day laborers for trespassing and solicitation.

63.      Special Order 09-07 singled out day laborers as a special target for enforcement of state trespass and solicitation laws.

64.      State solicitation law was selectively enforced against day laborers, because other groups were allowed to solicit in the roadway without complying with the Texas Transportation Code. *See, supra,* ¶¶ 70-74.

65.      Defendants' actions were motivated by an intent to curtail protected speech by plaintiff's members, and therefore constitute unlawful First Amendment retaliation.[8]

---

[8]      Plaintiff does not challenge the constitutionality of Texas Penal Code § 30.05(a). The court
(continued...)

29

### *Fourteenth Amendment Racial Discrimination Claim*

66.     The Equal Protection clause of the Fourteenth Amendment prohibits racial discrimination in the enactment or enforcement of laws. U.S. Const. Amend. 14.

67.     Plaintiff's members, Latino men who speak Spanish, are members of a protected class. *Hernandez v. State of Tex.*. 347 U.S. 475, 477-78 (1954).

68.     A § 1983 claim of racial discrimination in violation of the Fourteenth Amendment requires plaintiff to prove not only that defendants' actions had a discriminatory impact, but also that defendants had the intent to discriminate. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

69.     Sometimes actions may impact one group so disproportionately as to be evidence of discriminatory intent. *Id.* Circumstantial evidence such as the historical background of the actions, departures from the normal procedural sequence of events, and legislative or administrative history, may also be highly relevant to the issue of intent. *Id.* at 266-68.

70.     Latino men were disproportionately impacted by Special Order 09-07. However, it is undisputed that day laborers are almost exclusively Latino men, and this fact by itself does not demonstrate racial or ethnic animus.

71.     The court concludes that League City day laborers were not targeted based on

---

[8]     (...continued)
        cannot enjoin, indeed plaintiff does not even ask it to enjoin, enforcement of a legitimate
        penal statute such as Texas Penal Code § 30.05(a) as a remedy for alleged retaliation.

who they were, but on what they did – that is, exercise their right to free speech.

72.     Plaintiff has not met its burden of proof under *Village of Arlington Heights* that defendants acted with intent to discriminate based on race or national origin.

73.     Accordingly, plaintiff's Fourteenth Amendment racial and national origin discrimination claim should be denied.

### Permanent Injunction

74.     Plaintiff is entitled to permanent injunctive relief if (1) it has suffered an irreparable injury; (2) legal remedies are inadequate; (3) the balance of hardships weighs in favor of  an injunction; and (4) the public interest would not be disserved by a permanent injunction. *Ebay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

75.     The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373-74 (1976).

76.     Plaintiff's members have suffered, and continue to suffer, a loss of their First Amendment right to solicit.

77.     A legal remedy may be deemed inadequate if plaintiff shows that a monetary award would be speculative because the amount of damage would be difficult or impossible to measure, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952), or that effective legal relief can be secured only by a multiplicity of actions such that plaintiff would be required to pursue damages each time he was injured. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.,* 657 F. Supp.2d 795, 824 (S.D. Tex. 2009).

78.     If plaintiff is not afforded injunctive relief, plaintiff's members would be forced into the untenable position of either foregoing their constitutional right to solicit, or exercising that right and suing for damages each time they are subjected to unconstitutional harassment, citation, arrest, or imprisonment.

79.     A monetary award for each violation of a day laborer's First Amendment right to solicit would be speculative because the amount of damage would be difficult or impossible to measure.

80.     For these reasons, plaintiff has no adequate remedy at law.

81.     Any hardships faced by defendants from an injunction against enforcing Texas Transportation Code 552.007(a) are greatly outweighed by the hardships faced by plaintiff's members everyday when they are effectively deprived of First Amendment freedoms. This is especially true given the other legitimate means available to the defendants to ensure traffic and public safety in League City.

82.     The public interest is always served by upholding the principles embodied in the First Amendment. *Cate v. Oldham,* 707 F.2d 1176, 1190 (11th Cir. 1983).

83.     A permanent injunction against enforcement of Texas Transportation Code 552.007(a) and against continued use of Special Order 09-07 would serve the public interest by helping to restore faith and confidence in the justice system by all residents of League City.

84.     Based on these findings of fact and conclusions of law, plaintiff is entitled to a permanent injunction against enforcement of § 552.007(a) and directing that Special Order

32

09-07 be rescinded.

85.    Having prevailed on its First Amendment claims, plaintiff is entitled to an award of its reasonable attorneys fees and costs in prosecuting those claims. 42 U.S.C. § 1988.

## III.    Conclusion and Order

To summarize, in 2009 League City began a campaign of aggressively enforcing the state's pedestrian solicitation law against day laborers. That law, Texas Transportation Code § 552.007(a), on its face is a content-based restriction on protected speech. As applied by League City, the law is even more restrictive, effectively eliminating the right to solicit on public sidewalks and other public property adjoining city streets.  League City seeks to justify its campaign on the basis of public safety, but city records do not show a single traffic accident attributed to a day laborer. Even accepting traffic safety as a compelling governmental interest, however, League City has failed to justify a need to serve that interest through targeting and penalizing day labor solicitation. More effective means were readily at hand, such as directly targeting those who cause accidents and risk public safety without reference to their speech, as currently proscribed under the state's existing traffic and criminal laws. Laws that restrict more protected speech than necessary, like § 552.007(a), violate the First Amendment.

In accordance with the above findings of fact and conclusions of law, the court orders that judgment be issued in plaintiff's favor on its claims that Texas Transportation Code § 552.007(a) is unconstitutional on its face and as applied, and for First Amendment

retaliation.

It is ordered that judgment be issued in defendants' favor denying plaintiff's Fourteenth Amendment discrimination claim.

It is further ordered that, within 21 days after entry of this order, plaintiff shall submit a proposed final judgment granting declaratory and permanent injunctive relief consistent with these findings and conclusions, as well as a detailed declaration of reasonable attorneys fees and expenses incurred in prosecuting its successful claims.

Defendants may file objections within 14 days thereafter.

Signed at Houston, Texas on May 17, 2013.


Stephen Wm Smith
United States Magistrate Judge